**No. 40807.**—Protests 889441–G, etc., of E. E. Holler (Nogales).

KEEFE, Judge: The merchandise here involved consists of fresh sea bass caught in the Gulf of California. It was assessed for duty at 1 cent per pound under paragraph 717 (a) of the Tariff Act of 1930. The plaintiff claims that the fish is entitled to free entry under paragraph 1730 (a) as the product of American fisheries.

At the trial the record in the case of *Holler* v. *United States*, protest 919886–G, was incorporated with and made a part of the record herein. The master of the

fishing boat *Mabel*, L. C. Almond , testified that he executed the affidavit as master covering the sea bass in question; that a portion of the fish was caught by fishermen fishing from the deck of the boat and the remainder was caught by men fishing from canoes; that the canoes were procured through the local cooperative fishing society, the master asking the representative for a certain number of canoes and each of the owners of the canoes would select two other fishermen to fish with him in his canoe; that sometimes he would tow the canoes out to the fishing grounds and at times they would go out by themselves; that those in the canoes would do their fishing close to the *Mabel* and after the catch was made very often the *Mabel* towed the canoes to port; that the master of the *Mabel* is obliged to take the entire catch of the canoe fishermen; that after reaching the shore the fish are beheaded and cleaned by the fishermen or by men hired by the canoe owner; that the fish are then weighed in their presence and in the presence of a representative of the Cooperativa; that from the weights taken of the fish in each canoe the agreed price per kilo of fish caught is paid to the Cooperativa representative who deducts 1 centavo per kilo as Cooperativa dues and pays the respective owner of the canoe for his proportion of the catch; that, from the weights taken, a bill of sale or factura is made out by the representative of the Cooperativa and handed to the driver of the truck, without the payment of any money to the Cooperativa representative; and that this "factura" is necessary to enable the truck driver to take the fish over the border into the United States.

The question before us is whether or not the fish caught from the boat *Mabel* and the fish caught in the hired canoes are products of American fisheries. In *Holler* v. *United States*, protest 919886–G, C. D. 123, it was held that cabrella and pinto fish caught by native fishermen and native members of the crew together with the American master of the *Mabel*, a vessel of American ownership and registry, were the products of American fisheries. The fish there in question were treated after being caught in the same way as the fish here, that is to say, after delivery to shore they were cleaned and weighed, a record being kept of the catch by the truck driver who weighed the fish, and payment made to the fishermen individually for the fish caught. The only difference in the former case is that payment for the services of the fishermen was made directly to them, the master deducting 1 centavo per kilo for Cooperativa dues, which he paid to the Cooperativa for the fishermen. Here payment for the services of the fishermen was made to a representative of the Cooperativa who deducted the dues and then paid the owners of the canoes who paid those who worked upon his boat and helped him clean his fish.

In the former case it was held, first, that it was immaterial that the fish were landed in Mexico and from there transshipped to the United States, because the fish were not further advanced than permitted by the statute; second, that American fisheries derive their character at the time of their taking, and the privilege sought to be exercised by American fishermen for the free entry of the product of their industry may not be circumscribed by any foreign statute. We fail to find any difference between fish caught by fishermen hired for the purpose to fish from the American vessel and fishermen who fished from their canoes at a wage measured by the weight of the fish taken by them.

For the reasons stated, and following our holding in the incorporated case, we hold that the fish in question are entitled to free entry as the products of an American fishery under paragraph 1730 (a), Tariff Act of 1930, and judgment will be entered directing the collector of customs to reliquidate the entries and to make refund accordingly.

### DISSENTING OPINION

EVANS, Judge: I regret that I cannot agree with the majority opinion in this case. This is a companion case to protests 919886–G, etc., the record in which was introduced herein. Therefore the reasons given in that case for my dissent apply in the instant case.

In addition to the facts which persuaded me to dissent in the case of said protests 919886–G, etc., I observe that there are certain facts which tend further to corroborate my opinion that these fish were actually bought from the Cooperativa. The incorporated case relates to fish caught in May, June, July, August, and September. The fish in the initial case herein were caught in November. The men "on the boat" were selected by the Cooperativa. The Cooperativa or its agency selected the owners of canoes and the owners of canoes in turn selected the men to accompany said owners on the fishing trip. Thereafter they put to sea, fished, so far as the record shows, under the direction and supervision of the owner of each canoe and the fish were brought to the shore, unloaded, and eviscerated, and then weighed in the presence of a representative of the Cooperativa who recorded the weights of fish delivered to the shore by the respective fishermen.

On direct examination the master of the *Mabel*, Mr. L. C. Almond, testified as follows:

Q. How was the fish handled after the canoes came in? Was it turned over to you?—A. They weighed them in to our truck driver.

Q. And who did you pay for the fish that were caught in these canoes?—A. I paid the men in the office of the Cooperativa.

Q. You paid the men in the office of the Cooperativa for the fish from the canoes?—A. The man that I got the canoes from, in the office.

Q. In other words, you paid the man from whom you rented the canoes; you paid him so much per kilo for the fish which the canoes caught?—A. Yes, sir.

Q. Did you pay that for each canoe, or in a lump sum?—A. A lump sum.

Q. Did you designate how much went to each canoe?—A. No; they kept that record.

Q. Was the practice to which you have testified with respect to the canoes the same, approximately the same, or substantially the same throughout the period of your fishing down there for sea bass, with canoes and the *Mabel?*—A. The same practice on the *Mabel* as on the canoes.

After giving the foregoing testimony the witness, through skillful leading, as appears by the following testimony, changed his testimony with reference to the manner of paying for the fish caught from the *Mabel*:

Q. Is the testimony which you gave with respect to this particular protest—does it apply to all the protests which are consolidated, or in which canoes were used?—A. Yes, sir.

Q. The fishermen who fished off the *Mabel*, you paid them personally?—A. Yes.

Q. It is only with respect to the canoes rented from the Cooperativa that you paid the Cooperativa?—A. Yes, sir.

On cross-examination after going over his statement as to the manner of weighing, which statement indicates that the fish were weighed immediately upon landing the same (but since they were shipped cleaned that could hardly have been the fact), the master continued with his testimony as follows:

X Q. Then Mr. Garcia went in to get a factura from the Cooperativa for the whole shipment?—A. Yes, sir.

X Q. On these particular shipments of fish that were caught by the canoes, did you withhold one centavo per kilo and pay that to the Cooperativa?—A. No.

X Q. The owners of the boats did that themselves?—A. I paid that into the Cooperativa office in a lump sum.

X Q. You paid the Cooperativa?—A. Yes, sir.

X Q. And they took care of their own division?—A. Yes, sir.

X Q. And then you received the factura and sent it on? I mean your boy received the factura and sent the fish on its way?—A. Yes, sir.

I submit that the above testimony also indicates that the master paid the Cooperativa a lump sum for all the fish. The statement quoted above that "I paid that into the Cooperativa office in a lump sum," may have related to the 1 cent per kilo referred to in the above question. The subsequent questions indicate that his answer, "I paid that into the Cooperativa in a lump sum," is a further indication that he dealt directly with the Cooperativa and not with the individual fishermen.

In the incorporated record David B. Almond, who testified that he was the owner of the *Mabel* and who ultimately received the fish and paid the bills, stated on cross-examination, although from all that the record shows he had no direct knowledge, since it does not appear that he was ever at the fishing banks or ever participated in any of the proceedings there, nevertheless he stated:

X Q. In other words, your brother pays each man for the amount of fish that he catches?—A. That he caught; yes, sir.

X Q. Doesn't he pay him a certain price that is fixed by the Cooperativa in that locality?—A. All of the fish which are caught at a set price. If the price was 14 cents to all the fishermen, he paid the fishermen in those cases 10 cents and four cents went for the use of the equipment.

X Q. Didn't he also sell that fish to the Cooperativa, and they would resell it back?—A. No, sir. The dues for fishermen are one cent per kilo for all he catches; that is the union dues. He paid the fishermen and held that one cent for the Cooperativa, for dues.

It is submitted that with such contradictory testimony as is disclosed by this record the court ought not to give it much credence in view of documentary proof and of the requirements of the Mexican law.

I therefore think that the plaintiff's claims should have been overruled.